IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

MARTHA J. DUFFIELD,           )
                              )
        Plaintiff,            )
                              )
    v.                        )        CIVIL ACTION NO. 1:08cv317-CSC
                              )                    (WO)
MICHAEL J. ASTRUE,            )
Commissioner of Social Security, )
                              )
        Defendant.            )

**MEMORANDUM OPINION**

The plaintiff, Martha J. Duffield ("Duffield"), applied for disability insurance benefits

pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., and supplemental

security income benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 et

seq., alleging that she was unable to work because of a disability. Her application was

denied at the initial administrative level. The plaintiff then requested and received a hearing

before an Administrative Law Judge ("ALJ"). Following the hearing, the ALJ also denied

the claim. The Appeals Council rejected a subsequent request for review. The ALJ's

decision consequently became the final decision of the Commissioner of Social Security

(Commissioner).[1] *See Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The case is

now before the court for review pursuant to 42 U.S.C. §§ 405 (g) and 1631(c)(3). Pursuant

to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1, the parties have consented to the United

---

[1] Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L.
No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to
Social Security matters were transferred to the Commissioner of Social Security.

States Magistrate Judge conducting all proceedings in this case and ordering the entry of final judgment.  Based on the court's review of the record in this case and the briefs of the parties, the court concludes that the decision of the Commissioner should be reversed and this case remanded to the Commissioner for further proceedings.

## II.  Standard of Review

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . .

To make this determination,[2] the Commissioner employs a five-step, sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3)  Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

---

[2] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[3]

The standard of review of the Commissioner's decision is a limited one. This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A reviewing court may not look only to those parts of the record which support the decision of the ALJ but instead must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

### III. The Issues

**A. Introduction.** Duffield was 44 years old at the time of the hearing before the ALJ. (R. 301). She has an eighth grade education but she repeated two grades, including the eighth grade. (R. 301-02). Following the hearing, the ALJ concluded that Duffield has a

---

[3] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) is a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See e.g. Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

severe impairment of arthritis in the lower extremeties.  (R. 16).  He determined, however, that her mild major depression, hypertension and seizures were not severe impairments because these conditions were controlled by medication and did not cause more than a minimal impact on her ability to work.  (*Id*.).  The ALJ made no finding about whether Duffield's migraine headaches constitute a severe impairment.  The ALJ then concluded that because Duffield could return to her past relevant work as a motel housekeeper or a peanut picker,[4] she was not disabled.   (R. 19).

**B.  Plaintiff's Claims.**   Duffield presents three issues for the Court's review.  As stated by Duffield, they are as follows:

1. The Commissioner's decision should be reserved, because the ALJ failed to evaluate Ms. Duffield's mental impairments under the proper legal standard.

2. The Commissioner's decision should be reversed, because the ALJ failed to fulfill his duty to develop the record.

3. The Commissioner's decision should be reversed, because the ALJ erred by failing to find Ms. Duffield's seizure disorder and migraine headaches resulted in a severe impairment.

(Pl's Br. at 9).

### IV.  Discussion

A disability claimant bears the initial burden of demonstrating an inability to return to her past work.  *Lucas v. Sullivan*, 918 F.2d 1567 (11th Cir. 1990).  In determining whether

---

[4] Although the ALJ concluded that Duffield could return to her past relevant work as a peanut picker,  Duffield last worked as a peanut picker in 1979. This employment is beyond the 15 year period the Social Security Administration deems relevant as past work.  *See* SSR 82-62.

4

the claimant has satisfied this burden, the Commissioner is guided by four factors: (1) objective medical facts or clinical findings, (2) diagnoses of examining physicians, (3) subjective evidence of pain and disability, e.g., the testimony of the claimant and her family or friends, and (4) the claimant's age, education, and work history. *Tieniber v. Heckler*, 720 F.2d 1251 (11th Cir. 1983). The ALJ must conscientiously probe into, inquire of and explore all relevant facts to elicit both favorable and unfavorable facts for review. *Cowart v. Schweiker,* 662 F.2d 731, 735-36 (11th Cir. 1981). The ALJ must also state, with sufficient specificity, the reasons for his decision referencing the plaintiff's impairments. The court must scrutinize the record in its entirety to determine the reasonableness of the ALJ's decision. *See Walker,* 826 F.2d at 999. Within this analytical framework, the court addresses the plaintiff's specific claims, although not in the order presented. The court's approach necessitates a lengthy exposition of the plaintiff's medical history.

**A. Severe Impairments - Step Two**. The plaintiff argues that the ALJ erred when he failed to "find that . . . [her] seizure disorder and migraine headaches resulted in a severe impairment." (Pl's Br. at 15). After careful review of the evidence, the court concludes that the ALJ failed to properly consider whether Duffield's seizure disorder, migraine headaches, or depression constitute severe impairments at step two of the sequential analysis. It follows, therefore, that his determination that the plaintiff is not disabled is not supported by substantial evidence.

Duffield filed for disability alleging that she was disabled due to seizures, depression, epilepsy, high blood pressure and migraines. (R. 70). She described her disabling condition

5

as follows:

> i cannot drive a vehicle anymore due these seizures that i am having. i cannot sit no more than 30 minutes and i have arthritis in my legs and knees.  i get dizzy and i ususally pass out, and i have blackouts so bad, and i have headaches about 4 times per week.  i cannot remember to turn off the stove sometimes.  the seizures does not give any warning whenever they overcome me and i can be anywhere at anytime and just fall out.

(R. 70-71).  She alleges an onset date of April 27, 2005. (R. 66, 71).  Notes of her interview with the Social Security disability specialist indicate that Duffield exhibited difficulty understanding and concentrating as well as remembering.  (R. 68).

Medical records demonstrate that on November 13, 2003, Duffield presented to the University of Alabama at Birmingham ("UAB") Department of Neurology for an evaluation of her seizures.  (R. 165-66).  Duffield reported that she began experiencing seizures two weeks after a motor vehicle accident in April 2000.  (R. 165).  When she has a seizure, she experiences "tongue biting and frequently has incontinence as well as postictal headache and some postictal confusion."  (*Id.*)  Her previous CT scans and MRI did not reveal any focal abnormalities.  (*Id.*)  She was taking Dilantin, Keppra, and Effexor.  (*Id.*)  Although Dr. Knowlton preferred to conduct EEG monitoring, none was ordered because Duffield did not have insurance and could not afford the study.  (R. 166).  Dr. Knowlton opined that Duffield was suffered from "[p]robable complex partial seizures with secondary generalization."  (*Id.*)  "Since her seizure (sic) are not well controlled on her Dilantin we will switch her over to Carbatrol."  (*Id.*)  She was also taken off Keppra because that medication was very expensive.  (*Id.*)  Dr. Knowlton instructed Duffield to return in three months.  (*Id.*)

Duffield returned to Dr. Knowlton on February 19, 2004, reporting that she continued to have seizures, bad headaches, vision problems, constipation and vomiting. (R. 164). On February 24, 2004, Duffield began an intensive EEG-video monitoring that lasted until February 29, 2004. (*Id*.) The EEG was inconclusive. (*Id*.) Her Tegretol prescription was increased. (*Id*.)

On April 1, 2004, Duffield presented to UAB complaining that she continued to have seizures. (R. 161). When she has a seizure, her eyes roll back, her whole body shakes, she drools and bites her tongue, and she is incontinent. (*Id*.) She did not have pain with the seizures, but her feet swell. (*Id*.) She was diagnosed with Generalized Tonic-Clonic ("GTC") seizures and depression. (*Id*.)

On April 15, 2004, Duffield presented to the Kreutzmann Clinic complaining of fatigue, swelling in feet and legs, and dizziness. (R. 107). She was taking Topamax and Carbatrol to control her seizure disorder. (*Id*.). Dr. Kreutzmann noted that Duffield had weakness, swelling and muscle cramping, possibly from the Topamax. (R. 107).

Duffield returned to UAB on October 28, 2004. (R. 160). At that time, she reported that she had had at least one GTC seizure. She again complained of headaches, dizziness and vision problems. (*Id*.) She was diagnosed with Intractable partial epilepsy and migraine headaches. (*Id*.) Although she was prescribed Zomig, a prescription medication for the treatment of migraines, she was not taking it because Medicaid would not pay for it. (*Id*.)

On January 5, 2005, Duffield presented to the Southeast Alabama Medical Center emergency room complaining of lower back pain. (R. 112). She was diagnosed with

musculoskeletal back pain.  (R. 113).  She was prescribed pain medication and discharged.

(R. 113-16).  On January 9, 2005, Duffield returned to the emergency room complaining

again of back pain.  (R. 119).  She was diagnosed with acute myofascial strain, treated with

an epidural pain injection and discharged with prescription medication (R. 120-23).  At that

time, Duffield reported that she was taking Imitrex, Carbatrol, Lorcet and Flexeril.  (R. 121).

X-rays of her spine revealed "mild lower lumbar degenerative disc and joint disease."  (R.

124, 128).  A MRI revealed "[d]esiccation of the L4-L5 and L5-S1 disc with mild diffuse

disc bulge but no focal herniation or significant nerve root impingement.  Mild central disc

bulge at L4-L5 and L5-S-1. . . ."  (R.126-27).  Treatment notes indicate "diffuse tenderness

of the lumbar paraspinal muscles and tenderness over the lumbar spine."  (R. 131).  The

diagnostic impression included severe low back pain, seizure disorder, and migraine

headaches.  (*Id*.)  She was subsequently treated with a epidural injection, (R. 137), prescribed

a Medrol dose pack, referred to physical therapy, and discharged.  (R. 145).

On July 21, 2005, Duffield presented to UAB complaining of three to five seizures

per week.  (R. 159).  She complained of headaches, vision problems, dizziness, and diarrhea.

(*Id*.)  She was waking up with a "chewed up tongue;" she was stuttering and her hair was

falling out.  (*Id*.)  She was taking Carbatrol and Imitrex.  (*Id*.)  Dr. Knowlton referred her for

another EEG.  (*Id*.)

On August 7, 2005, Duffield presented to the emergency room complaining of chest

pain.  (R. 146-156).  She was treated with an epidural injection and released.  (*Id*.)

On August 26, 2005, Duffield presented to Dr. Taylor complaining of "[k]nots on

head and arthritis in left knee along with rash on back." (R. 169). She complained of migraines "at least once weekly, mostly in the frontal region, associated with nausea, blurred vision, and lightheadedness." (*Id.*) Her blood pressure was elevated, ad she was diagnosed with migraines, seizure disorder, arthritis, menopause, and suspected sebaceous cysts. (R. 170). Dr. Taylor prescribed Bactrim for her skin infection, APAP for her pain, Nortriptyline for her seizures, and Lotensin HCT for her high blood pressure. (*Id.*).

On August 30, 2005, Duffield underwent EEG-video monitoring for four days. (R. 158). Although the EEG did not reveal any positive evidence of epilepsy, she was continued on antiepileptic medication to combat her strong history of generalized tonic clonic seizures. (R. 158). She was continued on carbanazepine and her Zonegran was increased. (R. 157). Because she was also significantly depressed, she was prescribed Paxil. (*Id.*)

On October 28, 2005, Duffield presented to the emergency room complaining of chest pain. (R. 177-78). A chest x-ray revealed no abnormalities. (R. 183).

In a conversation with the disability specialist on November 1, 2005, Duffield reported that she had a seizure "about 2 weeks ago," and that she has seizures three times a week. (R. 84).

On December 19, 2005, Duffield was evaluated by Dr. Walter Jacobs, Ph.D., a licensed psychologist. (R. 188-91). Duffield reported to Dr. Jacobs that "she suffers from seizures, headaches, arthritis, back problems and depression." (R. 188). Although Duffield's speech progress was normal, she spoke with "some slight articulation difficulty," and the content of her speech was shallow. (R. 189). Although Dr. Jacobs did not administer any

I.Q. tests, he opined that Duffield's intelligence was borderline.  (R. 190).  Duffield appeared mildly depressed notwithstanding that she was being treated with antidepressants.  (*Id*.)  He concluded that Duffield suffered from "Major Depression, Recurrent, Mild" and "Borderline Intellectual Functioning."  (*Id*.)  In his opinion, Duffield "is capable of functioning independently and managing financial resources for her own best interests."  (R. 190-91).

On February 10, 2006, Duffield presented to UAB reporting that she had had one seizure since her last appointment.  (R. 241).  She was still having headaches and vision problems.  (*Id*.)  She was also taking Carbatrol, Zomig, Paxil and Imitrex.  (*Id*.)  She reported that she was driving some but the doctor explained that, under the law, she was not permitted to drive for six months.  (*Id*.)

On March 3, 2006, Duffield presented to the emergency room complaining of chest pain.  (R. 219-39).  X-rays were negative.  (R. 230).  She was treated with Pepcid intravenously, prescribed Anaprox and released.  (R. 229, 237).

On October 12, 2006, Duffield presented to UAB reporting that she had suffered two small seizures within three weeks.  (R. 240).  Prior to the seizures, she had a headache and then she lost consciousness.  (*Id*.)  During one seizure she was incontinent and during the other, she bit her tongue.  (*Id*.)  Dr. Knowlton noted that she was "doing better" but she still suffered from GTC seizures and depression.  (*Id*.)

On April 5, 2007, Duffield was seen at the Houston Medical Group complaining of abdominal pain.  (R. 268).  Her blood pressure was elevated and she was diagnosed with arthritis, GERD, abdominal pain and probable hemorrhoids.  (*Id*.)  She was prescribed

Omeprazole, APAP, Benicar, Lotensin, and referred for an x-ray of her knee[5] and to a gastrointestinal specialist.  (*Id*.)

At the administrative hearing on April 16, 2007, Duffield alleged she was disabled due to seizures, migraine headaches, back pain, and knee pain.  (R. 300).  She also alleged that her medications caused memory and concentration problems.  (*Id*.)  She testified that she still experiences seizures even though she is on medication.

> Q    Okay.  And the medications have helped some I would imagine.
> A    Yes, sir, it has.  The Carbatrol that they've got me on now, it helped relieve the seizures, but I still have the minor seizures.  Like, if I get upset or, or just tired, tired, I'll just fall out and stay out a few minutes, and then I come back to.
> Q    Okay.  and do you ever have any of the, the big seizures anymore?
> A    I haven't since.  I don't remember the last date, but I had one – it ain't been two weeks ago.  It was last year.
>
>                     *        *        *
> Q    When you have these smaller ones that you talk about, did they – I mean, do you literally fall down?  Do you black out?  What, what happens?
> A    I fall out, and I stay out a few minutes, and my head – my eyes will go in the back of my head.
> Q    Um-hum.
> A    And then I come back to in a little bit, and I don't know what I was doing prior to falling out.
> Q    How often does that happen to you?
> A    Sometimes three, three to four times a month, sometimes two times a week, sometimes it just barely –

(R. 304-05).

Duffield further testified that she suffers from headaches "that will last for four or five

---

[5]    At the administrative hearing, Duffield's attorney informed the ALJ that seven days earlier, she had x-rays of her knees.  (R. 299).  The ALJ gave Duffield's attorney thirty days to submit the x-rays. (*Id*.)  The x-rays are not in the record.

hours, sometime all day, and won't nothing relieve it." (R. 305). She has taken prescription medication as well as Tylenol for the pain. (*Id.*) The headaches occur three to four times a week. (R. 306).

Finally, Duffield testified that she takes Paxil for depression and that it helps "sometimes." (R. 315).

A physical or mental impairment is defined as "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(c). The medical records clearly demonstrate that Duffield suffers from seizures and depression which meet the definition of physical or mental impairment. However, the ALJ concluded that these impairments were not severe impairments because these conditions were controlled by medication. This is his first error.

The step two severity step is a threshold inquiry which allows only "claims based on the most trivial impairment to be rejected." *McDaniel*, 800 F.2d at 1031. Indeed, a severe impairment is one that is more than "a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." *Bowen v. Yuckert*, 482 U.S. 137, 154 n. 12 (1987) (citing with approval Social Security Ruling 85-28 at 37a).

> An impairment is not severe if it does not significantly limit the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a); *Crayton v. Callahan,* 120 F.3d 1217, 1219 (11th Cir. 1997). "Basic work activities" include: physical functions such as walking, standing, sitting, lifting, pulling, reaching, carrying, or handling; capacities for seeing, hearing,

and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b). An impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience. *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986). It is a threshold inquiry where only the most trivial impairments are rejected. *Id.* "The claimant's burden at step two is mild." *Id.*

*O'Bier v. Commissioner of Social Sec. Admininstration*, 2009 WL 1904709 (11th Cir. July 2, 2009) (No. 08-16419).

In concluding that Duffield's seizures and depression were not severe because they were controlled by medication, the ALJ improperly conflated the step two severity analysis with the step four residual functional capacity analysis. *See e.g. McDaniel v. Bowen*, 800 F.2d 1026, 1031-32 (11th Cir. 1986) (Discussion showing that the ALJ improperly "imported" consideration of step five in the sequential analysis at step two.). The ALJ did not consider the effects of Duffield's seizures and depression on her ability to work – i.e. whether her seizures and depression would have more than a "minimal effect" on her ability to work.[6]

Furthermore, although the record is replete with references to migraine headaches, the ALJ makes no findings about whether her migraine headaches constitute a severe

---

[6]For example, the presence of a more than slight or minimal limiting impairment satisfies the second criteria of section 12.05(C) even if the impairment is treatable. *Cf. Davis v. Shalala*, 985 F.2d 528, 535 n.3 (11th Cir. 1993) citing *Edwards by Edwards v. Heckler*, 755 F.2d 1513 (11th Cir. 1985). The second criteria of 12.05(C) requires a physical or other mental impairment imposing additional and significant work-related limitation of function. Thus, it should follow that an impairment may be severe even if treatable so long as the impairment limits a person's ability to do work.

impairment.  (R. 70, 71, 164, 160, 121, 131, 159, 169, 170, 188, 241, 240, 300, 305).  As already noted, the severity step is a threshold inquiry which allows only "claims based on the most trivial impairment to be rejected." *McDaniel*, 800 F.2d at 1031.  The medical evidence establishes that the claimant suffers from migraine headaches, an impairment which is not so slight or minimal that it would not interfere with the plaintiff's ability to perform basic work activities.  Consequently, while it is plain that the plaintiff suffers from migraine headaches, what is not plain is the effect of those headaches on her ability to work.  "'Even a "mild" mental impairment may "prevent [a] claimant from engaging in the full range of jobs contemplated by the exertional category for which the claimant otherwise qualifies.'" *Allen v. Sullivan*, 880 F.2d 1200, at 1202 (11th Cir. 1989).

     The ALJ then compounded his errors  by failing to consider the side effects of Duffield's medications on her ability to work.   The ALJ was required to consider whether the plaintiff experiences any side effects from her medications, and if so, whether those side effects impact her ability to work.  The side effects of medication may render a claimant disabled or at least contribute to a disability. *Cowart  v. Schweiker,* 662 F.2d 731, 737 (11th Cir. 1981).   The record demonstrates that Duffield has been prescribed the following medications:  APAP[7] (R. 170, 268); Benicar[8] (R. 268); Lotensin[9] (R. 170, 268); Dilantin[10]

---

[7]  APAP is a prescription acetaminophen which is similar to Tylenol.

[8]  Benicar is used to treat hypertension.

[9]  Lotensin is also used to treat hypertension.

[10]  Dilantin is used to treat and control generalized tonic-clonic seizures.

(R. 166); Anaprox[11] (R. 229, 237); Carbatrol[12] (R. 107, 121, 157, 159, 160, 166, 241); Zomig[13] (R. 241, 160); Paxil[14] (R. 157, 241); Imitrex[15] (R. 121, 159); Zonegran[16] (R. 157); Effexor[17] (R. 165); Topamax[18] (R. 107); Nortriptyline[19] (R. 157); Lorcet[20] (R. 121); Flexeril[21] (R. 121) and Tegretol[22] (R. 164).   However, the ALJ made no findings regarding the effects of these medications on Duffield's ability to work, and thus, the court is unable to determine whether the ALJ's conclusion that Duffield is not disabled is supported by substantial evidence.

Frankly, that conclusion is contrary to the evidence.   It is obvious from the record before the court that the plaintiff suffers from both physical and mental impairments as well as non-exertional impairments of pain and depression.   However, as a result of the ALJ's

---

[11]   Anaprox is a non-steroid anti-inflammatory drug used to treat arthritis and other pain.

[12]   Carbatrol is an anti-convulsant medication used to treat seizure disorders.

[13]   Zomig is used to treat acute migraines.

[14]   Paxil is used to treat major depression.

[15]   Imitrex is also used for the treatment of acute migraines.

[16]   Zonegran is one part of the treatment for seizures.

[17]   Effexor is also used for treatment of major depression.

[18]   Topamax is used to treat patients suffering from partial or primary generalized tonic-clonic seizures.

[19]   Nortriptyline is used to treat depression.

[20]   Lorcet is the brand name of hydrocodone/acetaminophen and is used to treat moderate to severe pain.

[21]   Flexeril is used to treat muscles spasms and acute pain.

[22]   Tegretol is a brand name for carbamazepine and is used to treat seizures.

failure to properly consider the plaintiff's impairments at step two of the sequential analysis, the effects of those impairments on Duffield's ability to work are at this juncture unknown.

For these reasons, the court concludes that the Commissioner erred as a matter of law, and that the case should be remanded for further proceedings regarding the severity of the plaintiff's seizure disorder, depression and migraine headaches and the effect of these conditions and her medication, on her ability to work.

**B. Credibility Analysis and Pain** .  During the administrative hearing, Duffield testified that she suffered from headaches, lower back pain, and knee pain. (R. 305-09). She testified that the pain "get[s] so bad that I can't do nothing."  (R. 307).  In this circuit, the Commissioner must consider a claimant's subjective testimony of pain if he finds evidence of an underlying medical condition, and either (1) objective medical evidence to confirm the severity of the alleged pain arising from that condition, or (2) that the objectively determined medical condition is of a severity that can reasonably be expected to give rise to the alleged pain.  *Mason v. Bowen*, 791 F.2d 1460, 1462 (11th Cir. 1986); *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986).  If the Commissioner fails to articulate reasons for refusing to credit a claimant's subjective pain testimony, then the Commissioner has, as a matter of law, accepted the testimony as true.  This rule of law is well-established in this circuit. *See Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991); *Holt v. Sullivan*, 921 F.2d 1221 (11th Cir. 1991)*; Hale v. Bowen*, 831 F.2d 1007 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050 (11th Cir. 1986).

Moreover, "[p]ain is clearly a non-exertional impairment that limits the range of jobs

the claimant can perform." *Foote,* 67 F.3d at 1559; *Walker*, 826 F.2d at 1003 ("Pain is a nonexertional impairment."). *See also Phillips v. Barnhart*, 357 F.3d 1232, 1242 fn 11 (11th Cir. 2004) ("Nonexertional limitations or restrictions affect an individual's ability to meet the other demands of jobs and include . . . pain limitations. . .")  Furthermore, pain itself can be disabling. *See Foote*, 67 F.3d at 1561; *Marbury v. Sullivan*, 957 F. 2d 837, 839 (11th Cir. 1992).

Prior to reciting the law and describing the medical evidence, the ALJ acknowledged that Duffield has impairments that would reasonably be expected to produce the type of pain about which she complains, but the ALJ then concluded that Duffield's testimony was "not entirely credible." (R. 18).  In discrediting Duffield's testimony, the ALJ said only the following:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

(R. 18).

Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate *reasons* for doing so, or the record must be obvious as to the credibility finding. *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995); *Jones v. Dept. of Health & Human Servs.*, 941 D.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "'the ALJ must either explicitly

discredit such testimony or the implication must be so clear as to amount to a specific credibility finding.'"  *Foote*, 67 F.3d at 1562, *quoting Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir 1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

In this case, the ALJ wholly failed to articulate any reason for discounting the plaintiff's *credibility* and *her pain testimony*.  The ALJ's recitation of the medical evidence is not a substitute for articulating clear reasons for discrediting the plaintiff.  The ALJ's discussion of her seizures, headaches and depression are not *reasons* to discredit her.  Simply put, the ALJ's conclusory credibility analysis is deficient as a matter of law.  The court notes that this is not the first time that it has been called upon to review this type of conclusory credibility analysis and is, quite frankly, disturbed by the  frequency by which this flawed analysis continues to appear.

**C.  Re sidual Functional Capacity finding.**    The ALJ determined that Duffield suffers from the severe impairment of arthritis in the lower extremities.  He also determined that she "has the residual functional capacity to lift or carry no more than 20 pounds occasionally or 10 pounds frequently (i.e. light work)."  (R. 17).  Unfortunately, the ALJ makes no more specific findings regarding Duffield's residual functional capacity.  Consequently, the court is unable to determine what evidence the ALJ relied upon to reach his decision, and whether that decision is supported by substantial evidence.

Although the medical records demonstrate numerous trips to the emergency room by the plaintiff complaining of pain, the ALJ took no further steps to explore the extent of the

18

plaintiff's physical impairments by securing a physical consultative examination.  Where a consultative evaluation is needed to make an informed decision, it is error for an ALJ not to order such an evaluation.  *Reeves v. Heckler*, 734 F.2d 519 (11th Cir. 1984).

"Social Security proceedings are inquisitorial rather than adversarial.  It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 110-111 (2000).  An ALJ may not arbitrarily pick and choose facts from the medical evidence to support his conclusion without articulating specific, well supported reasons for crediting some evidence while discrediting other evidence. *Marbury v. Sullivan*, 957 F.2d 837, 839, 840-841 (11th Cir. 1992).  Thus, the court concludes that the Commissioner inadequately developed the record in this case by failing to secure additional medical evidence about the extent of the plaintiff's physical impairments.

**D.  Questioning of the   Vocational Expert** .  Finally, the court concludes that a remand is necessary because the ALJ erred, as a matter of law, in his questioning of the vocational expert.

"When the ALJ uses a vocational expert, the ALJ will pose hypothetical question(s) to the vocational expert to establish whether someone with the limitations that the ALJ has previously determined that the claimant has will be able to secure employment in the national economy." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004).  A vocational expert's testimony is fatally deficient if the ALJ's hypothetical questions fail to precisely set out all of the claimant's impairments. *See Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002) citing *Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999). *See also Harrell v. Harris*, 610

19

F.2d 355, 359 (5th Cir. 1980) (citing with approval *Stephens v. Secretary of Health, Ed. and Welfare*, 603 F.2d 36, 41 - 42 (8th Cir. 1979).

At the administrative hearing, in formulating his hypotheticals to the vocational expert, the ALJ and the vocational expert engaged in the following colloquy.

Q    Assume I find a hypothetical individual the same age as the Claimant with the same educational level and educational history. Assume further I find the following additional limitations: This individual can perform a full range of light work. Could that person go back to the Claimant's past relevant work or any part thereof?

A    Yes, sir, she can return to all the past relevant work.

Q    If we add the limitations that can be found on Exhibit C, C-8-D, would that preclude any of her past relevant work (INAUDIBLE) file?

A    C-8 –

Q    D.

A    No sir.

Q    Okay. And if we add the limitations that can be found on C-13-F, which is a RFC, would that preclude any of her past relevant work?

A    C-13-F says no limitations established, and that would not preclude any work.

Q    (INAUDIBLE) be found on C-11-F and C-12-F, which is an RFC and a psychiatric VRT, would that preclude any of the past relevant work?

A    No, sir.

Q    And if we add the limitations from Exhibit C-10-F, which is the report of Dr. Walter (INAUDIBLE), would that preclude any of her past relevant work?

A    No, sir.

Q      Okay.  Is your testimony consistent with the DOT Standards?

A      Yes, sir, it is.

(R. 317-18).

In this colloquy, the ALJ refers to specific exhibits in the file, including physical evaluation forms.  (*Id.*).  However, the ALJ never defines for the vocational expert what he considers to be the plaintiff's medical limitations or functional restrictions nor does he describe what he considers to be "basic work activities."  The ALJ's questioning of the vocational expert is so vague, the court cannot determine whether the ALJ and vocational expert had the same understanding of Duffield's ability to do basic work activities or even whether they shared the same understanding of Duffield's limitations.

In *Brenem v. Harris*, 621 F.2d 688 (5th Cir. 1980), the ALJ failed to include psychological limitations in the hypothetical questions posed to the vocational expert.  The district court concluded that because the medical records referenced Brenem's psychological limitations, the ALJ's questions were sufficient.  The then Fifth Circuit Court of Appeals reversed.

> We do not think it is proper to assume that because the vocational expert was aware of Brenem's psychological problems, that he took them into consideration in answering hypothetical questions which referred only to physical impairments.  Or at least we have no basis for assuming that had these factors been included in the hypothetical questions his answers would have been the same.

*Id*. at 690.

The court's concern is applicable here.  Because the ALJ did not comprehensively

describes Duffield's impairments, the court declines to assume what limitations the vocational expert actually considered in determining that she could perform work.  This error is particularly a problem where the plaintiff asserts pain and other non-exertional impairments as bases for disability, since even mild or moderate non-exertional limitations may prevent a claimant from engaging in a range of work for which the plaintiff is otherwise qualified.  The court may not assume that the vocational expert was aware of the ALJ's determination of the level of pain suffered by the plaintiff or to what extent the vocational expert took Duffield's pain into consideration in answering the hypothetical questions posed by the ALJ.  *See generally Pendley v. Heckler*, 767 F.2d 1561 (11th Cir. 1985) (where hypothetical upon which vocational expert based his testimony did not assume claimant's anxiety or depression, both of which the ALJ found to be severe impairments, ALJ's decision was unsupported by substantial evidence).

In his questioning of the vocational expert, the ALJ never explains or describes to the vocational expert the extent of the plaintiff's impairments or any restrictions her impairments may have on her ability to perform light work.  Accordingly, the court is forced to conclude that the ALJ erred, as a matter of law, by not fully explaining or describing all the plaintiff's impairments and restrictions in the hypothetical questions posed to the vocational expert. Thus, because of the ALJ's omission of relevant facts from his hypothetical to the vocational expert, this case must be remanded to the Secretary.  Upon remand, the Secretary shall elicit vocational testimony based upon a complete and comprehensive description of the plaintiff's exertional and non-exertional impairments, as well as any restrictions she may have, in order

to properly assess her disability claim.

### V.  Conclusion

The court has carefully and independently reviewed the record and concludes that the

decision of the Commissioner is due to be REVERSED and this case REMANDED to the

Commissioner for further proceedings.

A separate order will be entered.

Done this 7th day of December, 2009.


_____/s/Charles S. Coody_____
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE